No. 22-4060

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
*Appellee*

v.

JERALD FRANCIS GRAY,
*Appellant*

On Appeal from the United States District Court
for the Western District of Virginia
Roanoke Division (Hon. Thomas T. Cullen)

Appellant's Appendix
Pages 1 – 71

**Juval O. Scott**
Federal Public Defender
for the Western District of Virginia

**Benjamin Schiffelbein**
Assistant Federal Public Defender
210 First Street SW, Ste. 400
Roanoke, VA 24011
(540)777-0880

**Christopher Kavanaugh**
United States Attorney
for the Western District of Virginia

**Matthew Miller**
Assistant United States Attorney
310 First Street, S.W. Room 906
Roanoke, VA 24011
(540)857-2250

**Rachel Barish Swartz**
Assistant United States Attorney
310 First Street SW, 9th Floor
Roanoke, VA 24011
(540)257-2250

*Counsel for Appellant*

*Counsel for Appellee*

## TABLE OF CONTENTS

Transcript of detention hearing ........................................................... 1

Magistrate judge's order of detention ............................................. 52

Magistrate's supplemental order of detention.............................. 55

Defendant's request for District Court to review Magistrate's order of detention...... 56

Government's response in opposition............................................ 58

District Court's Memorandum Opinion affirming Magistrate's decision .................... 64

Email chain between counsel, the court, and pretrial services ...................................... 70

```
 1              IN THE UNITED STATES DISTRICT COURT
                  WESTERN DISTRICT OF VIRGINIA
 2                      ROANOKE DIVISION

 3    ****************************************************************
      UNITED STATES OF AMERICA,
 4
                 Plaintiff,           CRIMINAL NO.: 7:21MJ166
 5                                    December 17, 2021
                                      Roanoke, Virginia
 6                                    Initial Appearance and
      -v-                             Detention Hearing
 7
      JERALD FRANCIS GRAY,            Before:
 8                                    ROBERT S. BALLOU
                                      UNITED STATES MAGISTRATE JUDGE
 9               Defendant.           WESTERN DISTRICT OF VIRGINIA

10    ****************************************************************
      APPEARANCES:
11
      For the Plaintiff:
12
      MAGGIE CLEARY
13    United States Attorneys Office
      310 First Street SW, 9th Floor
14    Roanoke, VA 24011
      540-857-2250
15    maggie.cleary@usdoj.gov

16    For the Defendant:

17    CHRISTINE LEE
      Federal Public Defender for the Western District of Virginia
18    210 First Street SW, Ste 400
      Roanoke, VA 24011
19    540-777-0888
      christine_lee@fd.org

20

21    _____

22                 Brittany Davis - FTR Recorder
                   Mary J. Butenschoen - Transcriber
23

24    PROCEEDINGS TAKEN BY FTR; TRANSCRIBED USING COMPUTER-AIDED
      TRANSCRIPTION
25
```

1                              INDEX

2     WITNESS NAME                                      PAGE

3     FOR THE GOVERNMENT:

4     **LYNNE WITT**

5        Direct Examination By Ms. Cleary.......................... 11

6        Cross-examination By Ms. Lee............................... 20

7        Redirect Examination By Ms. Cleary ....................... 29

8     FOR THE DEFENDANT:

9     **KIMBERLY FALATIC**

10       Direct Examination By Ms. Lee ............................. 30

11

12

13

14

15                            *  *  *  *  *

16

17

18

19

20

21

22

23

24

25

USA v. Jerald Francis Gray - 12/17/2021                    3

```
1    (Proceedings commenced 3:11 p.m.)
2             THE COURT:  Mr. Gray, my name is Robert Ballou.  I'm
3    magistrate judge here in the Western District of Virginia.  Let
4    me start by -- first of all by asking Ms. Davis to call the
5    case, please.
6             THE CLERK:  United States of America v. Jerald
7    Francis Gray, Criminal Action Number 7:21MJ166.
8             THE COURT:  Let the record reflect the government is
9    present by its counsel and defendant, likewise, is present
10   along with counsel.
11            Mr. Gray, good afternoon.  Like I said, my name is
12   Robert Ballou.  I'm magistrate judge here in the Western
13   District of Virginia.  We're heard today in connection with a
14   new criminal complaint that's been filed as to a Jerald Francis
15   Gray.  Let me introduce you to everyone who is on the screen
16   here so you'll know who they are and what their role is, and
17   then we'll get about to your hearing.  Of course, we have your
18   attorney, Ms. Lee.  Ms. Cleary is the United States Attorney
19   involved in your case.  Lynne Witt is the government law
20   enforcement agent with the FBI that's involved in your case.
21   Ms. Falatic is with our probation office.  You may have spoken
22   with her or one of her colleagues in advance of today's
23   hearings.  And Ms. Davis, she's our courtroom deputy who
24   coordinates these proceedings.
25            You can see a black box that says "Judge Ballou's
```

USA v. Jerald Francis Gray - 12/17/2021               4

1   public line".  That's in the event that anyone wishes to listen

2   to today's proceedings, they can certainly do so, but they can

3   not participate, but they can hear everything that's ongoing.

4                All right.  So let me start, Mr. Gray, by asking you

5   to state your full name for me, please, sir.

6                THE DEFENDANT:  Jerald Francis Gray.

7                THE COURT:  How old are you, sir?

8                THE DEFENDANT:  49.

9                THE COURT:  How far did you go in school?

10               THE DEFENDANT:  I graduated high school.

11               THE COURT:  All right.  Fair to say you read and

12  write English?

13               THE DEFENDANT:  Sir?

14               THE COURT:  Do you read and write English without a

15  problem?

16               THE DEFENDANT:  Yes.

17               THE COURT:  Very well.  And today you feel

18  clearheaded and understand where you are and why you're here?

19               THE DEFENDANT:  Yes, sir.

20               THE COURT:  All right.  Mr. Gray, you're entitled to

21  have this hearing before me in person if you wish to do so.  We

22  can proceed by videoconference only with your agreement and

23  permission.

24               Do you understand that?

25               THE DEFENDANT:  Yes, sir.

USA v. Jerald Francis Gray - 12/17/2021                5

1          THE COURT:  Do I have your permission to proceed by

2    way of videoconference?

3          THE DEFENDANT:  Yes, sir.

4          THE COURT:  All right.  Ms. Lee, on behalf of

5    Mr. Gray, do I have your permission to proceed by way of

6    videoconference?

7          THE DEFENDANT:  Yes, Your Honor.

8          THE COURT:  Thank you very much.  So Mr. Gray, the

9    Fifth Amendment of the Constitution guarantees you the right to

10   remain silent.  You don't have any obligation at all to make

11   any statements about these charges or to answer any questions

12   put to you by the government or its investigating officers, its

13   agents, or its attorneys.  You do not have to participate in

14   the government's investigation.  The fact of the matter is you

15   never have to take the stand to testify unless you choose to do

16   so.

17         I will advise you that if you choose to waive your

18   right to remain silent, if you wish to make any statements or

19   answer any questions or if you don't wish to testify today or

20   any other time in the future, anything that you say can be used

21   against you.

22         Do you understand this?

23         THE DEFENDANT:  Yes, sir.

24         THE COURT:  Now, the Sixth Amendment of the

25   Constitution gives you the right to be represented by an

USA v. Jerald Francis Gray - 12/17/2021                    6

1    attorney who will assist you in understanding the nature of the

2    charges you face in challenging the government's evidence, as

3    well as confronting and cross-examining the government's

4    witnesses.  Likewise, an attorney will assist you with

5    preparing and presenting any defenses that you may have to

6    these charges.  You can hire any lawyer that you see fit to

7    represent you, but if you cannot afford an attorney the

8    government will appoint one for you at its expense.

9              Do you understand this?

10             THE DEFENDANT:  Yes, sir.

11             THE COURT:  I do have your financial affidavit that

12   you've completed when you spoke with probation by telephone.

13   Am I correct that you wish to have me appoint an attorney for

14   you?

15             THE DEFENDANT:  Yes, sir.

16             THE COURT:  All right.  On that financial affidavit,

17   understand you have an obligation to provide information that

18   is truthful and correct to the best of your knowledge.

19   Otherwise it may be considered a separate felony offense for

20   providing false information under oath.

21             Do you understand that?

22             THE DEFENDANT:  Yes, sir.

23             THE COURT:  And is the information that you provided

24   to the probation officer true and correct to the best of your

25   knowledge?

USA v. Jerald Francis Gray - 12/17/2021                    7

1          THE DEFENDANT:  Yes, sir.

2          THE COURT:  All right.  So based upon the allegations

3    that are set forth in the complaint, based upon your affidavit,

4    I find you qualified to have counsel appointed.  I'm going to

5    appoint Ms. Lee to be your attorney, and she'll represent you

6    for as long as this matter is pending.

7          So Mr. Gray, this is a one-count criminal complaint

8    that alleges a charge of possession of child pornography in

9    violation of 18 United States Code, Section 2252(a)(4).  The

10   complaint -- have you received a copy of it?

11         THE DEFENDANT:  No, sir.

12         THE COURT:  Okay.  We will have that emailed to you

13   there at Western Virginia.  Ms. Lee, you now have a copy of the

14   complaint.  Am I correct about that?

15         MS. LEE:  Yes, Your Honor.

16         THE COURT:  All right.  First of all, is there -- is

17   there any objection to sending the complaint to Mr. Gray there

18   at Western Virginia?  Sometimes complaints of this nature you

19   do not want in the jail.

20         MS. CLEARY:  I don't believe so.  Let me ask agent

21   Witt, is that correct?

22         MS. LEE:  No, it's not up to you.

23         THE COURT:  No, it's --

24         MS. CLEARY:  Oh, sorry.

25         THE COURT:  It's more of a question -- it's a

USA v. Jerald Francis Gray - 12/17/2021                    8

1      question of Ms. Lee.  It's for Mr. Gray's safety.

2               MS. CLEARY:  Got it.

3               MS. LEE:  Mr. Gray, they are going to send it to you

4      unless you don't want this type of paperwork in the jail.  I

5      usually say you don't want it in the jail.

6               THE DEFENDANT:  That's fine, yes.

7               MS. LEE:  Okay.

8               THE COURT:  Let's -- let's not do that.  Ms. Lee, you

9      have had an opportunity to go over the --

10              MS. LEE:  Yes.

11              THE COURT:  -- the complaint with Mr. Gray?

12              MS. LEE:  I sure have.

13              THE COURT:  Very well.  So the complaint -- you will

14     at a point in time in the future, you will see it.  There's no

15     doubt, Mr. Gray.  The complaint, it has two parts.  The front

16     page lays out the nature of the complaint, or nature of the

17     charge, and then behind that is a -- is a -- an affidavit

18     prepared by a federal law enforcement agent on which the

19     government contends there's at least probable cause that you

20     committed this offense.  You are entitled to a preliminary

21     hearing at which the government would have to put on sufficient

22     evidence for me to find there is at least probable cause that

23     you committed this offense.  And if I find that, the matter

24     then goes to the grand jury.

25              Now, under the Seventh Amendment, you cannot be

USCA4 Appeal: 22-4060   Doc: 6   Filed: 02/02/2022   Pg: 11 of 73
Case 7:22-cr-00001-TTC-RSB   Document 25   Filed 01/10/22   Page 9 of 51   Pageid#: 40

USA v. Jerald Francis Gray - 12/17/2021                    9

1   convicted or tried on this charge unless the grand jury reviews

2   your case and decides that there's probable cause to issue an

3   indictment.

4              Do you understand this?

5              THE DEFENDANT:  Yes, sir.

6              THE COURT:  All right.  So if you waive your right to

7   a preliminary hearing or just consent based upon the -- what's

8   in the complaint, you don't waive anything.  It simply goes to

9   the grand jury.

10             Understanding that, Ms. Lee, how do you wish to

11  proceed as it relates to Mr. Gray on a preliminary hearing?

12             MS. LEE:  Your Honor, if the government is requesting

13  detention, we would request a detention hearing right now.

14             THE COURT:  Okay.  And a preliminary hearing as well?

15             MS. LEE:  Yes.  Thank you.

16             THE COURT:  All right.  Ms. Cleary, what's going to

17  be the government's position as it relates to detention?

18             MS. CLEARY:  We're requesting detention, Your

19  Honor.

20             THE COURT:  All right.  Are you ready to proceed now

21  with a preliminary and a detention hearing?

22             MS. CLEARY:  Yes, Your Honor.

23             THE COURT:  All right, very well.

24             All right.  Call your first witness, please.

25             MS. CLEARY:  Your Honor --

USA v. Jerald Francis Gray - 12/17/2021          10

1      THE COURT:  Everybody have the pretrial services

2  report that it's been docketed?

3      MS. CLEARY:  Yes.

4      MS. LEE:  Your Honor, I have to apologize for being

5  such a nuisance to your entire staff on so many of these, but I

6  do think that we -- especially with Ms. Falatic have figured it

7  all out now.  She has started sending bond reports to an email

8  which we asked her to send them to, but that our parallels did

9  not know to check.

10      THE COURT:  Right.

11      MS. LEE:  So I do believe that we will be less of a

12  nuisance going forward on future -- future initial hearing

13  days.  And thank -- please thank every relevant person for

14  their patience with me.

15      THE COURT:  You would not do your job if you didn't

16  pursue the things that you thought were necessary.  And I spoke

17  to -- Ms. Lee, just so you'll know, I spoke to Ms. Williams --

18      MS. LEE:  You mean a week or two ago.

19      THE COURT:  Well, whenever it was, and we agreed

20  that, you know, once the pretrial services report is made

21  available to me and to the government, it absolutely needs to

22  be made available to the defendant, and so I think it was going

23  to be mailed over.  Because there is that problem that until

24  you're appointed you can't get into a --

25      MS. LEE:  Docket.

1          THE COURT:  -- sealed document, so...

2          MS. LEE:  Right.  Thank you.  Thank you.

3          THE COURT:  All right, thank you.

4          All right.  Ms. Cleary?

5          MS. CLEARY:  And Your Honor, I'm sorry, just to

6    clarify, are we proceeding with a preliminary hearing now or

7    the detention hearing?

8          THE COURT:  Well, we'll put them together.  It will

9    be a preliminary hearing and detention at the same time.

10         MS. CLEARY:  Got it, okay.  So we'll call Agent

11   Witt.

12         THE COURT:  All right.  Ms. Witt, if I can get you to

13   raise your right hand.

14           LYNNE WITT, CALLED BY GOVERNMENT, SWORN

15         THE WITNESS:  I do.

16         THE COURT:  All right.  Thank you very much.

17         Go ahead, please, Ms. Cleary.

18         MS. CLEARY:  Okay.

19                     DIRECT EXAMINATION

20   BY MS. CLEARY:

21   Q    Can you state your name for the Court, please.

22   A    Lynne Witt.  L-Y-N-N-E.  W-I T-T.

23   Q    And how are you employed?

24   A    I'm a special agent with the FBI here in Roanoke.

25   Q    And were you so employed and on duty and involved in the

Witt - Direct                                                    12

1    investigation of Mr. Gray?

2    A    Yes.

3    Q    Can you tell us how you proceeded in that investigation?

4    A    Information law enforcement became aware of, a

5    peer-to-peer network -- excuse me.  A person utilizing a

6    particular IT address on a peer-to-peer file sharing network

7    that was requesting, downloading, information files that

8    represented child pornography.

9    Q    And you became --

10   A    So --

11   Q    Sorry.  You became aware of an IP address that was

12   requesting images of what law enforcement knew to be child

13   pornography.

14   A    Yes.

15   Q    Okay.

16   A    And so we further researched the owner of that IP address.

17   It was owned by Lumos Network, and further administrative

18   subpoena that was served to that subscriber was listed as

19   Jerald Gray with an address of 610 East Cedar Street,

20   Covington, Virginia.

21   Q    And is that within the Western District of Virginia?

22   A    It is.

23   Q    Okay.  And how did you proceed?

24   A    We then did further investigative steps to determine who

25   was indeed residing at 610 East Gray [sic] Street and

Witt - Direct                                                              13

1    determined that Mr. Gray was the resident there, amongst

2    another adult person that did verify that that was his current

3    address.

4    Q    And who all resided at that address?

5    A    There is his adult daughter lives there.  Would you like

6    me to name her?

7    Q    No, it's okay.  And anyone else?

8    A    And two minor grandchildren, the children of his adult

9    daughter.

10   Q    And how old are those children?

11   A    Approximately eight and seven years of age.

12   Q    And so when you arrived at that address, did Mr. Gray

13   indicate which computer was his?

14   A    So when we -- we -- a federal search warrant was obtained

15   and we -- for the residence of 610 East Cedar Street, and that

16   was executed on December 8.  And as a result of that execution

17   of the search warrant, Mr. Gray volunteered to an interview,

18   and in that interview identified his bedroom in the house and

19   that there was a computer system set up in there and he

20   described it to us during that interview.

21   Q    As being his computer.

22   A    Yes.

23   Q    And what did your search return on Mr. Gray's computer?

24   A    On scene the day of the search there were present two FBI

25   agent CART examiners, and through their analysis of that

Witt - Direct                                                        14

1    computer system they were able to observe on the C drive the --

2    a file name with the peer-to-peer network that got us all

3    started for this where we had seen the user of this IP

4    requesting child pornography files.  And so they saw that

5    folder.  And so further into that was a downloads folder that

6    contained approximately 60 files.  I believe they are all video

7    type files and most with names that are indicative of child

8    pornography, CSAM.  Child Sexual Abuse Material.  Names

9    indicative of that.

10   Q    And you reviewed one of those files?

11   A    I did review one on scene that day, and I was subsequently

12   given a copy of -- a working copy of those approximate 60

13   files.  And I watched a different video, which is the one

14   outlined in the complaint that was described.

15   Q    Okay.  And so you all now have possession of Mr. Gray's

16   computer; is that correct?

17   A    Amongst other things, yes.

18   Q    Okay.  And those 60 files were downloaded in the folder

19   with the peer-to-peer network's name on his computer?

20   A    They were located in a folder named "downloads".

21   Q    Okay.  And so have you had the chance to fully

22   forensically analyze Mr. Gray's computer?

23   A    That has not been conducted by myself or others more

24   trained in that technique at this time.

25   Q    And so to date, the only thing you've gone through is the

Witt - Direct                                                          15

1    downloads file from that folder with the peer-to-peer network's

2    name?

3    A    I've observed a few videos from that collection of 60

4    files.

5    Q    Okay.  And you said that those videos -- or the video that

6    you viewed on scene that day you would describe as CSAM?

7    A    Yes, or child pornography, yes.

8    Q    As child pornography, okay.

9         Now, on that day, December 8, did you all interview

10   Mr. Gray?

11   A    Yes.

12   Q    And what did Mr. Gray say during that interview?

13   A    He confirmed he had Lumos Network.  He confirmed where his

14   bedroom was in the house and described the computer set up

15   which matched with where the agents had viewed the peer-to-peer

16   network being used on that device.  He said he's the primary

17   user of that computer system.  He did admit to downloading

18   files from the peer-to-peer file sharing network that was

19   suspected of sharing those files at the very beginning that I

20   referenced.  He and then admitted to reviewing files that

21   were -- that appeared to be child pornography CSAM material and

22   that -- and so he -- that's what he had -- some of the

23   statements that he made during that interview.

24   Q    So following, was Mr. Gray offered a polygraph

25   examination?

Witt - Direct                                                    16

1    A     He was offered during that interview and the arrangements

2    for a polygraph interview -- and the arrangements were made for

3    him to have that occur on the following day there in Covington.

4    And so he arrived himself to the place of the polygraph, and at

5    that point I introduced him to the polygrapher, and he, you

6    know, takes over that part of the process.

7    Q     And so following the polygraph, was another interview

8    conducted with Mr. Gray?

9    A     The polygrapher conducted a post-polygraph interview.

10   Q     Okay.  And what did Mr. Gray state during that

11   interview?

12   A     He admitted to -- first off, he -- he admitted to

13   having -- at first he admitted to having touched the breasts of

14   one of his daughter's friends, whose victim's -- whose name is

15   known to me, in approximately June of -- well, in 2005.  And so

16   he admitted to that, touching of her breasts in the overnight

17   hours.

18   Q     So let's talk a little bit more about that.  So during --

19   so during the interview he was asked about an incident in 2005

20   with a friend of his daughter's, and she was a juvenile at the

21   time; is that right?

22   A     Correct.

23   Q     We can call her initials "S.S.".

24   A     Okay.  In preparing for identifying everything about the

25   residence of 610 Cedar Street, obviously, we learned about

Witt - Direct                                                              17

1   Mr. Gray and also learned about complaint filed with Covington

2   Police Department in 2005 by the then, you know, minor victim

3   S.S..  And so I was privy to -- I was able to review her

4   statement provided at the time to Covington Police Department.

5   The report read they were not able to -- nothing ever was

6   adjudicated or charged from that, and I believe it was in

7   November of 2005.  It was put into an inactive status by

8   Covington Police Department.  And so given the nature of why we

9   were searching at 610 East Cedar Street, I wanted -- that is

10  why that was brought up with Mr. Gray during the interview

11  about that time frame and that incident

12  Q    Now, initially the statements that Mr. Gray has made to

13  the polygrapher, were those consistent with what you had read

14  in the report that was given by S.S. in 2005?

15  A    It was not completely consistent.  His first statement to

16  the polygrapher stated he had touched the victim's breasts.

17  And in reviewing the victim's statement at the time in 2005,

18  she had reported that he had kissed her breasts.  And so the

19  polygrapher addressed this issue with Mr. Gray, and Mr. Gray

20  did then reveal to the polygrapher that, yes, I did kiss her

21  breasts.

22  Q    All right.  And at the time do we have an estimate of what

23  S.S.'s age might have been?

24  A    I think roughly 12.

25  Q    Okay.  Now, was there another incident that Mr. Gray spoke

Witt - Direct                                                          18

1   with with the polygrapher in terms of touching underage

2   women?

3   A    He referenced that there was a babysitter that would come

4   to their house -- and this was prior to the 2005 incident.

5   That would come to their house, and he referenced like playing

6   on the floor with her, and in that playing his hand would --

7   would touch her breasts long enough, but not too long.  And so

8   that is something else that he disclosed in his post-polygraph

9   interview to the polygrapher.

10  Q    Now, in speaking with the polygrapher, did he indicate

11  sort of what ages of young girls he was most interested in?

12  A    In the interview to us on December 8, he said, you know,

13  older teenage -- or not young children, but kind of that early

14  teen/preteenage is what he preferred.

15  Q    And did he make other statements to you-all or to the

16  polygrapher about seeing women in street, seeing girls in the

17  street?

18  A    He would describe incidences where he's out in a public

19  venue, such as a store or supermarket, and see an attractive

20  minor-aged female and then would later return home and

21  masturbate when thinking about that young female he had seen

22  previously.

23  Q    And what statement did he make about masturbating

24  involving the incident with S.S. in 2005?

25  A    I'd have to review the polygrapher's report to get more --

Witt - Direct                                                            19

1    to be more specific with that.

2    Q    Okay.  Was there anything else during your investigation

3    that Mr. Gray stated about either this incident -- or that he

4    stated about this incident in 2005?

5    A    Can you repeat your question?  Sorry.

6    Q    Was there anything else that Mr. Gray stated about the

7    incident in 2005 that we have not spoken about?

8    A    We -- we discussed from the victim's statement that was

9    made in 2005, she recounted Mr. Gray returning into the room a

10   second time and I think touching her -- her buttocks area.

11   When Mr. Gray was asked about that, he -- he couldn't remember

12   clearly if that had happened or not.

13   Q    Okay.  Okay, thank you.

14              MS. CLEARY:  We'll pass the witness, Your Honor.

15              THE COURT:  Before, Ms. Lee, you start

16   cross-examining, Ms. Witt, you testified that you reviewed a

17   video as described in the complaint.  Is that described in

18   paragraph 11 of the complaint?

19              THE WITNESS:  Yes, it is.

20              THE COURT:  Ms. Lee, is there any objection to me

21   reviewing paragraph 11 for the nature of that video or would

22   you rather have that on the record so you can cross-examine?

23   Of course, if you allow me to review it, it's certainly

24   available to your cross-examination as well, but --

25              MS. LEE:  I absolutely do not object to you reviewing

Witt - Cross                                                              20

1    paragraph 11.

2              THE COURT:  Okay.  All right.  Thank you very much.

3              Go ahead, Ms. Lee.

4                        CROSS-EXAMINATION

5    BY MS. LEE:

6    Q    When you first -- okay.  What's the first contact you had

7    with Mr. Gray?

8    A    Mr. Gray would have been on the morning of December 8.

9    Q    Was it by phone or in person?

10   A    It was in person.

11   Q    So you knocked on his door?

12   A    We executed a search warrant at his residence.  As a part

13   of that execution he was called out of the house.

14   Q    Okay.  What was his demeanor?

15   A    I would say calm.  I think, you know, wondering what was

16   going on.  And I would describe him as cooperative.

17   Q    Okay.  And you say you offered him a polygraph.  What do

18   you mean by offer?  Like normally when one offers something

19   it's for the other person's benefit.  You mean you asked him to

20   take a polygraph?

21   A    I did ask him if he would be willing to take a

22   polygraph.

23   Q    And what did you tell him was the purpose of that

24   polygraph?

25   A    The purpose was to be able to have the polygrapher derive

Witt - Cross                                                           21

1   questions as it relates to any contact offenses that Mr. Gray

2   may have had with a minor, any sexual contact offenses he may

3   have had with any minor.

4   Q    You told him that was the reason; we want to know if you

5   have had contact with minors?

6   A    I believe that's what I told him, yes.

7   Q    Okay.  And he -- he agreed to do that.

8   A    He agreed and came back on the subsequent day voluntarily

9   to the police department for that.

10  Q    He never asked for an attorney or anything like that,

11  right?

12  A    No, he did not.

13  Q    Is it fair to say that if he had not told you about this

14  2005 situation you would not have known about it?

15  A    If I understood your question, that is incorrect.  I knew

16  about the 2005 incident from the police report made to

17  Covington Police Department.  So I knew that prior -- I knew

18  that prior to talking to him on December 8, if that was what

19  your question was.

20  Q    It was my question.

21  A    Okay.

22  Q    So you asked him about the 2005 incident?

23  A    Yes.

24  Q    And he told you an incomplete account.  Well, it's still

25  an account of him engaging in wrongdoing, right?

Witt - Cross                                                      22

1    A     On doing the interview on December 8, he did not admit to

2    that contact, or to the allegations made in the report.  He was

3    aware of the person's name as being a friend of his daughter's,

4    but he did not admit to the allegations that were in the police

5    report during his interview on December 8.

6    Q     Did he deny the allegations in the police report?

7    A     He did.

8    Q     But then he admitted them during the polygraph?

9    A     In a post-polygraph interview, yes.

10   Q     Was he asked during the polygraph "did you touch -- did

11   you ever touch S.S.?"

12   A     That was not -- that was not one of the -- he was given

13   two pertinent questions.  That was not it.  I would have to

14   look at the report to tell you the specific questions asked.

15   Q     At some point, though, in the course of -- I'm sorry, what

16   day was the polygraph?

17   A     The following day, December 9.

18   Q     Okay.  So between the 8th and the 9th, he admitted to the

19   conduct involving S.S.

20   A     In his post-polygraph interview he did make that

21   admission.

22   Q     Okay.  Do you know when in relation -- okay, let me back

23   up.

24         From what you know, S.S. was a guest at his house,

25   right?

Witt - Cross                                                        23

1   A     Yes.

2   Q     She was visiting his daughter, who was at that time a

3   minor.

4   A     Yes.

5   Q     And let me just ask you another question:  Ms. Cleary

6   asked you whether he said -- what he said about ages that he

7   has felt sexually disposed towards.  And you used the word

8   "preteen".  He did not use that word, right?

9   A     I can't recall the exact wording that he used at this

10  time.

11  Q     He gave -- did he give specific ages to you?  Numbers?

12  A     I could -- I'd have to -- I think that came up in the

13  interview.  Without reviewing the notes or the interview, I

14  wouldn't want to say on the record without being able to

15  refresh my memory, but I do --

16  Q     Could you please look at your notes and refresh your

17  memory?

18  A     Yes.

19  Q     Thank you.

20  A     Within the notes I see that he referenced he's trying to

21  watch young teen girls.

22  Q     Okay.  So he didn't use the word "preteen".

23  A     That's not what was written in the notes by the

24  notetaker.

25  Q     Okay.  Were you present for that interview?

Witt - Cross                                                          24

1    A    I was.

2    Q    Okay.  So the notetaker and you were both present.

3    A    Yes.

4    Q    Okay, thank you.

5         Could you please tell the Court -- and this is relevant to

6    the detention hearing part of it.  What kind of house does

7    Mr. Gray live in?

8    A    A modest house, two-story if you count maybe -- there's a

9    top level entry level story and then a basement level.  I would

10   describe the upper main entry level as where the bedrooms and

11   living area is and down below is a kitchen area.  I believe

12   that's where the rest room, the bathroom, is for the home and

13   some other storage type rooms.

14   Q    Do you know if he owns the home?

15   A    I do believe he owns the home.

16   Q    Do you know --

17   A    In comparison to like renting it, ma'am?  Is that --

18   Q    Yes.  Yes.

19   A    Owning, uh-huh.

20   Q    Okay.  Do you remember there was a dog there?

21   A    I don't recall a dog.

22   Q    Okay.  Did you find -- did you find any firearms on the

23   premises?

24   A    There was no firearms found.

25   Q    Was his adult daughter home at the time?

Witt - Cross                                                    25

1    A    She was.  Of the search, yes.

2    Q    Did you interview her?

3    A    I spoke to her very briefly, but I would say I didn't --

4    you know, I did not interview her.  And that was sort at the

5    end of things when she I think was going to be going off to get

6    food or, you know, sort of leaving -- leaving the area.

7    Q    Okay.  Where does Mr. Gray work, if you know?

8    A    He's employed by Waco, Inc., and as I understand it he

9    does railroad type work for the large -- I think it's a paper

10   plant or mill that is there in Covington.

11   Q    Did you arrest him today?

12   A    I did.

13   Q    Okay.  And he was at work, right?

14   A    When I -- I arrested him in the parking lot of the

15   Covington Police Department.

16   Q    Okay.  Could you tell the Court how that went.  Did you

17   call him from the parking lot?

18   A    I did call him from the parking lot.

19   Q    And what did you say --

20   A    And told him that I was -- I told him that I was there and

21   that I had a phone to return to him.

22          THE COURT:  You broke up there for a second there,

23   Ms. Witt.  You said you had a federal -- and then you broke up.

24          THE WITNESS:  So starting back, I said I called him

25   from the parking lot, the Covington Police Department parking

Witt - Cross                                                        26

1    lot, and told him that I had a phone that I could return to him

2    there.  Did that answer your question?

3              THE COURT:  It did, thank you.

4    BY MS. LEE:

5    Q    Was that -- that was untrue?

6    A    I did not have a phone that I was going to be returning to

7    him, no.

8    Q    And I'm going to guess that you said that because if you

9    say we're here to arrest you he might not come outside; is that

10   right?

11   A    Agree to meet me.

12   Q    I'm sorry?

13   A    I said or agree to meet with me.

14   Q    Okay, I got it.  But in fact, when he came outside and you

15   made moves to arrest him, he did not run, correct?

16   A    He did not run, no.

17   Q    Okay.  I have one more question, if I can just remember

18   it.

19        The incident in 2005, it was reported --

20   A    I'm sorry.

21   Q    You're fine.  It was reported to the police, but Mr. Gray

22   was never charged with anything?

23   A    It's not reflected in the file, and nor did I see anything

24   of that on his criminal history in the Covington Police

25   Department.  I'm not aware --

Witt - Cross                                                          27

1    Q    Did you -- go ahead.

2    A    I'm not aware of him being charged for that based on

3    that --

4    Q    Did you talk to the Covington police about it?

5    A    I did.

6    Q    And they told you that they closed the case?

7    A    It just reflects that in November of that year it was put

8    into an inactive status, as they could not locate Mr. Gray, and

9    that's all I know.

10   Q    So the Covington records state that they closed the case

11   because they could not locate Mr. Gray, right?

12   A    I see the phrase "inactive status".  I don't know if that

13   means closed case in their language.  So inactive status.

14   Q    According to the Covington police, they placed the case in

15   inactive status because they could not locate him, right?

16   A    Yes.

17   Q    But from your search he's actually lived in Covington for

18   30 years, right?

19   A    I don't -- I think he's referenced living at that

20   particular address for 20.  Prior to that I'm not aware if it

21   was all in Covington to make 30 years.

22   Q    Okay.  So he's lived at the house since before 2005, and

23   he lives there now, right?

24   A    Yes.

25           MS. LEE:  That's all I have of this witness.  Thank

Case 7:22-cr-00001-FPC-RSB   Document 23   Filed 01/10/22   Page 28 of 51   Pageid#: 59

Witt - Cross                                                          28

```
 1    you.
 2              THE COURT:  I don't believe I have any questions.
 3    Actually, Ms. Witt, let me -- let me ask this:
 4              Either through your interview or the polygrapher's
 5    interview, was Mr. Gray asked any questions as to whether he
 6    had had any contact with juveniles other than what was laid out
 7    in the 2005 incident or what I'll call the babysitter incident?
 8              THE WITNESS:  Without -- I could look at the report
 9    and tell the Court the exact statements that I do believe
10    represented a broad question to sexual contact with minors.  So
11    he was asked about that through the polygraph questions.  I
12    do -- I will say that he denied any sexual contact offenses on
13    his grandchildren and on his daughter.
14              THE COURT:  Okay.  And the grandchildren are eight
15    and seven  What sexes are those?  Male, female.
16              THE WITNESS:  They are female.
17              THE COURT:  Both females, okay.  Do you know whether
18    the daughter is aware of the 2005 incident or the babysitter
19    incident that Mr. Gray has discussed in his interviews?
20              THE WITNESS:  I have not reviewed a report yet of the
21    conversations that she had the morning of the search with that
22    particular group.  I don't think that she talked about the 2005
23    incident.  And she briefly -- and previously when I mentioned I
24    spoke to her, very briefly before she departed she had vaguely
25    said something -- I remember something about a babysitter and I
```

Appellant's App. 28

1    knew nothing more than that.

2             THE COURT:  All right.  Thank you.  That's all the

3    question I have.

4             Ms. Cleary, does my question or Ms. Lee's questions

5    prompt any redirect?

6             MS. CLEARY:  Yes, Your Honor.

7                       REDIRECT EXAMINATION

8    BY MS. CLEARY:

9    Q    Special Agent Witt, can you describe -- so when you were

10   talking about the bedroom -- or, I'm sorry, the home, I think

11   you said that downstairs, the basement level, there is a

12   bathroom and storage.  So are all of the bedrooms on the same

13   level of the home?

14   A    That's how it appeared to me, yes.

15   Q    So there's no bedroom in the basement level.

16   A    Not that I observed.  I did not observe every room in the

17   house.  My primary time was spent with Mr. Gray.  But the two

18   bedrooms of the home were on the main -- main level, not the

19   basement level.

20   Q    And the grandchildren's date of births were in the years

21   2013/2014; is that right?

22   A    I believe that's correct.

23   Q    So they are somewhere in the seven, eight, nine range?

24             MS. CLEARY:  Okay.  Okay.  That's all, Your Honor.

25             THE COURT:  All right, thank you very much.  Thank

Falatic - Direct                                                    30

```
 1    you, Ms. Witt.
 2              All right.  Any other evidence, Ms. Cleary, other
 3    than for me to take notice of the pretrial services report?
 4              MS. CLEARY:  Just that, Your Honor.
 5              THE COURT:  All right.  Thank you very much.
 6              Ms. Lee?
 7              MS. LEE:  Your Honor, I would like to ask just a few
 8    questions of Ms. Falatic.
 9              THE COURT:  All right.  Ms. Falatic, let me get you
10    sworn, if I could, please.
11              KIMBERLY FALATIC, CALLED BY DEFENDANT, SWORN
12              THE WITNESS:  I do.
13              THE COURT:  All right.  Go ahead, please, Ms. Lee.
14                          DIRECT EXAMINATION
15    BY MS. LEE:
16    Q    I know we've worked with compressed time, so you -- I'm
17    sorry.  Could you state your name and your job for the
18    record?
19    A    Kimberly Falatic, and I'm a supervising U.S. probation
20    officer here in the Roanoke office.
21    Q    Did you personally interview Mr. Gray on the phone for
22    this --
23    A    I did.
24    Q    -- presentence report?  Okay.
25         But you were unable to speak to anybody else about him
```

USCA4 Appeal: 22-4060   Doc: 6   Filed: 02/02/2022   Pg: 33 of 73
Case 7:22-cr-00001-PTC-RSB   Document 23   Filed 01/10/22   Page 31 of 51   Pageid#: 62

Falatic - Direct                                                          31

```
 1   because --
 2   A    Yes, I left a message for his daughter, and she literally
 3   just called about ten seconds ago.
 4   Q    Okay.  You were able to learn that she herself has an open
 5   criminal case, correct?
 6   A    Yes, ma'am.
 7   Q    And what's that for?
 8   A    Possession of a Schedule I or II controlled substance.
 9   Q    That's personal use possession, from what you can see?
10   A    I do not know that.
11   Q    Well, it's possession.  It's not possession with intent to
12   distribute, okay.
13   A    Yes.
14   Q    Okay.  And do you know her age?
15   A    She is 28.
16   Q    28 years old.  And works at Wendy's, to the best of your
17   knowledge?
18   A    Yes, that's what Mr. Gray indicated.
19        MS. LEE:  Okay.  Court's indulgence.
20   BY MS. LEE:
21   Q    Did you find Mr. Gray cooperative and forthcoming in your
22   interview with him?
23   A    Yes, he was.
24        MS. LEE:  That's all the questions I have.
25        THE COURT:  Go ahead, Ms. Cleary.
```

USCA4 Appeal: 22-4060    Doc: 6    Filed: 02/02/2022    Pg: 34 of 73
Case 7:22-cr-00001-PTC-RSB    Document 23    Filed 01/10/22    Page 32 of 51    Pageid#: 63

USA v. Jerald Francis Gray - 12/17/2021                    32

1          MS. CLEARY:  No questions, Your Honor.

2          THE COURT:  Ms. Falatic, it appears as though -- you

3     were the interview officer.  You made a recommendation of

4     release?

5          THE WITNESS:  Yes, sir.

6          THE COURT:  I'm going to ask a compound question.  If

7     I was a lawyer I would object to it, but I'm going to ask it

8     just so we can -- and that is:  First of all, can you tell me

9     why you recommended release?  Secondly, did you know about the

10    polygraph interviews and the contact?  And does that

11    information change your recommendation?

12         THE WITNESS:  I recommended release because he owns

13    his own home, he's been a resident of Covington for over 20

14    years, I think he's owned his home, and he's been in Virginia

15    for over 30 years, and he's employed full-time doing the same

16    work.  He was with one company, but that contract ended, and

17    that's why he transferred over to Waco, is because they

18    received a contract.

19         THE COURT:  Okay.  Secondly, did you -- you've heard

20    Special Agent Witt testify.  Did you know anything at all about

21    the polygraph interview and the 2005 and the babysitter

22    incident that she's discussed in her testimony?

23         THE WITNESS:  I was not aware of that prior to

24    writing and recommending bond in this case.

25         THE COURT:  How, if at all, does that affect your

USA v. Jerald Francis Gray - 12/17/2021          33

```
1    recommendation in this case?

2              THE WITNESS:  Our concern would be the safety of his

3    grandchildren and the safety of the community at large for what

4    he has admitted during his polygraph interview, and I'm not

5    sure what conditions the Court could fashion to reduce that

6    risk now.

7              THE COURT:  Because the grandchildren live there

8    and -- in large part or --

9              THE WITNESS:  With his daughter working, there would

10   be no adult there to supervise him with contact with his

11   granddaughters.

12             THE COURT:  Okay.  Any questions -- we don't know

13   anything at all about -- all we know is what Ms. Witt has

14   testified to that he has denied any contact with his daughter

15   or granddaughters, correct.

16             THE WITNESS:  Yes, Your Honor.

17             THE COURT:  Okay.  I think that's all the questions I

18   have.

19             Ms. Lee, it was your witness.  Any further questions

20   of Ms. Falatic?

21   BY MS. LEE:

22   Q    In fashioning your initial recommendation, you also took

23   into account that he does not have a serious criminal history,

24   right?

25   A    Yes.
```

USA v. Jerald Francis Gray - 12/17/2021                34

1   Q    And there was no evidence of failure to appear or anything

2   like that, right?

3   A    Correct.

4            MS. LEE:  That's all I have of -- everything else is

5   argument, and I think there's enough in the pretrial services

6   report to inform my argument.

7            THE COURT:  Okay.  Ms. Cleary, do my questions of

8   Ms. Falatic prompt any questions from your perspective?

9            MS. CLEARY:  No, Your Honor.

10           THE COURT:  All right, thank you.

11           All right.  Any other evidence, Ms. Lee?

12           MS. LEE:  No, Your Honor, thank you.

13           THE COURT:  All right.  Ms. Cleary, argument?

14           MS. CLEARY:  Your Honor --

15           THE COURT:  Let me ask one question just real quick.

16           Ms. Lee, do you submit on probable cause or do you

17   want me --

18           MS. LEE:  Yes.  Yes, I submit on probable cause.

19   Yes, I do.

20           THE COURT:  Okay.  All right.  Go ahead, Ms. Cleary.

21   Focus on just detention.

22           MS. CLEARY:  Right, so just for detention.

23           So Your Honor, the government is going to ask that he

24   be held in this case, and this is exactly for the reasons that

25   were stated previously, which is that the government is not

USA v. Jerald Francis Gray - 12/17/2021          35

1    concerned that Mr. Gray is a flight risk.  It's true that he's

2    owned his home, that he stayed in the same community for this

3    many years.  The biggest concern for the government is that he

4    is a danger to the community because of this 2005 incident.

5    This is something that was reported in 2005 by this minor, who

6    was a friend of his daughter's, who was at the house for a

7    sleepover.  That police report, which he was ultimately

8    confronted with after not one but two but the third time,

9    Mr. Gray did ultimately admit that this has happened; that this

10   was not just a casual touching.  This goes far beyond this.  He

11   is ultimately kissing a prepubescent girl's breasts.  Now, this

12   is consistent with what he's told law enforcement in terms of

13   what he's -- quote, unquote -- attracted to.  He said that he's

14   attracted to prepubescent girls.  So in this, you know, 13, 14,

15   15 age range.  And given that his daughter lives in the home

16   with him and that his granddaughters both live in the home with

17   them and that they are quickly approaching that range and that

18   he frequently will be out in public and he'll see women of

19   that -- young girls of that age range and continue to be

20   attracted to them, the government just believes that given all

21   of this he is a risk to the community.  He's in a home with two

22   young girls.  They are all in bedrooms that are on the same

23   floor and very close together, and the government believes that

24   it would be best that he's detained until his trial.

25              THE COURT:  Thank you, Ms. Cleary.

USCA4 Appeal: 22-4060    Doc: 6    Filed: 02/02/2022    Pg: 38 of 73
Case 7:22-cr-00001-PTC-RSB   Document 23   Filed 01/10/22   Page 36 of 51   Pageid#: 67

USA v. Jerald Francis Gray - 12/17/2021          36

1          Ms. Lee?

2          MS. LEE:  Your Honor, what would be best is not a

3     test.  This is not a presumption case.  It's a presumption of

4     release unless no combination of conditions could be

5     established to assure the safety of the community.

6          The government is hanging its hat on an uncharged

7     conduct that occurred 16 years ago but is suddenly concerned --

8     I mean, the police who investigated it were not concerned

9     apparently at all.  After three months they said they couldn't

10    find the subject.  And honestly, that's the craziest thing I've

11    ever heard.  I've never heard of the police dismissing a case

12    because they can't find the culprit.  Especially when he's not

13    even anywhere -- right in front of them.  I'm not saying that

14    the 2005 incident didn't happen and should not give the Court

15    some concern that should translate into the Court's imposing

16    conditions designed to protect the community, but --

17          THE COURT:  Help me understand what those conditions

18    are, because I think that's what Ms. Falatic said was her

19    concern.

20          MS. LEE:  Yes.

21          THE COURT:  Was how do we protect the

22    grandchildren.

23          MS. LEE:  Okay.  I'm going to be candid.  I told

24    Mr. Gray "Judge Ballou is not going to want you living with

25    your children pretrial".  I could sit here and argue, no, they

USCA4 Appeal: 22-4060    Doc: 6    Filed: 02/03/2022    Pg: 39 of 73
Case 7:22-cr-00001-FFC-RSB    Document 23    Filed 01/10/22    Page 37 of 51    Pageid#: 68

USA v. Jerald Francis Gray - 12/17/2021                37

1    are outside of his, you know, apparent preferred range, but,

2    you know, the Court has to be concerned, and I'm not going to

3    deny that.

4         Mr. Gray I can proffer does own his home outright.

5    He is not paying a mortgage on it, and he has an excellent job

6    that provides him with an income.  And there's a subplot here

7    which is that he supports -- he financially supports his

8    daughter and granddaughters at the home.  She works at Wendy's,

9    but it's hard to make a living at Wendy's.  So I would grant

10   that the Court -- it would be reasonable for the Court to want

11   to ensure a separation between -- even though there's been no

12   allegations of anything for 15 years, and there has not been --

13   and he was polygraphed.  I wish I could do it over and tell my

14   clients don't ever, you know, submit to a random polygraph,

15   especially when they are executing a search warrant on your

16   home.  But the facts are what they are, and he did submit to a

17   polygraph and he was confronted with events from his past.  But

18   even that polygraph did not yield any information regarding any

19   conduct occurring in the last 16 years.  And that's a huge

20   period of time.  So whatever --

21        THE COURT:  We don't know -- and what we don't

22   know -- we know what his answers were, and Ms. Cleary

23   rightfully did not ask what the polygraph results were because

24   I don't think that's --

25        MS. LEE:  Yes.

USA v. Jerald Francis Gray - 12/17/2021          38

1        THE COURT:  -- something I can consider.  So we know

2   what his answers were, but I don't know what the polygraph

3   revealed.

4        MS. LEE:  Right.  But we have the post polygraph --

5        THE COURT:  Interview, right.

6        MS. LEE:  -- confrontation that yielded this

7   information.

8        THE COURT:  Correct.

9        MS. LEE:  So where we are is that we do not have any

10  information regarding any contact offense for 16 years.  We

11  have him charged with an offense that does not create a

12  presumption of detention, and we have all the traditional

13  indicia of dangerousness and risk of flight in his favor.  He's

14  got the stable job of many years.  He's got the home that's

15  paid off.  He's got an absence of committing offenses on

16  release.  He's got an absence of failing to appear.

17        I would respectfully -- and I -- I'm not being as

18  zealous on his behalf as I could be, but I'd respectfully ask

19  that the Court release him, and I would not object to the

20  Court's imposing a requirement that he not have any

21  unsupervised conduct with any children, including those in his

22  own family, or any other children, obviously, which are not --

23  which are not -- I mean, that's a gimme, but the Court would

24  have to give to provide that condition.

25        I don't think there's any reason to believe or to

```
 1   question that he would be able to sustain that in this pretrial
 2   period.  He would go to work.  I believe that he would have to
 3   get himself an apartment or similar for this pretrial period.
 4   I believe he'd have to move out of his home for this pretrial
 5   period, or his daughter and children would have to move out,
 6   but I don't think that would be fair to them.  And I've warned
 7   him that I was going to suggest that in an effort to allow the
 8   Court to fashion conditions that would agree -- reasonably
 9   show -- again, the test does not guarantee the safety of the
10   community.  The test is reasonably sure.  But if he were to
11   move out of his home, and given the age of the allegations, I
12   would -- I would respectfully request that as a condition.
13              THE COURT:  All right.  Thank you, Ms. Lee.
14              Ms. Cleary?  And I think you can address your -- your
15   comments to the issue of if -- and I'll put it this way:
16   Whether he moves out or his daughter and children move out, if
17   Mr. Gray lives in a place by himself free of the internet, free
18   of anything along those lines, what is the government's
19   position then?  In other words, with electronic monitoring and
20   no contact with children, what is -- what's the government's
21   position at that point?
22              MS. CLEARY:  Your Honor, the first thing the
23   government is going to point out is that presently -- and I
24   think that this has come up very quickly, but there seems to be
25   no plan for Mr. Gray to move out.  It would be difficult to
```

1   figure out a way in which, you know, his adult daughter who is

2   raising two minor children to be able to all of a sudden leave

3   and be someplace else.  Either they live someplace else or he

4   lives someplace else on simply his meager salary.

5           And in the midst of this keeping in mind that -- and

6   I don't know what their custody status would be, but certainly

7   keeping in mind that his daughter does have this pending court

8   date in January of this year for her felony charges as well.

9           But in terms of Mr. Gray living by himself, and what

10  the government wanted to address in regards to Ms. Lee's

11  argument as to the fact that this is not a presumption case,

12  currently, just to situate this case into kind of larger

13  statute and case law here, currently Mr. Gray is only charged

14  with one count of possession of child pornography.  However,

15  given what Special Agent Witt has testified to today, there

16  were 63 downloads that were found on Mr. Gray's computer.

17          Now, so I think technically -- you know, he could

18  have been charged with 63 counts of possession of child

19  pornography.  But in addition to that, the vast -- or however

20  many images or videos that are actually on his computer are

21  presently unknown.  So the only thing that we're aware of at

22  this moment is this very brief interview with the -- with

23  the -- with the person who conducted the polygraph, the

24  polygrapher, in addition to these 63 images.

25          Now, technically -- I'm sorry.

1      THE COURT:  But from a -- from my perspective and

2   your burden of establishing that clear and convincing evidence,

3   is it all that I can go on either -- not either, but what he's

4   been charged with, not with what's possible.

5      MS. CLEARY:  Yes.  No, no, I understand.  I

6   understand.  But I will just point out -- you know, since

7   technically Mr. Gray wasn't charged -- wasn't ever fully

8   charged -- or wasn't ever charged period with that 2005

9   incident, but what I was just going to point out was that if

10  Mr. Gray had been charged with a download, which is -- or with

11  receipt of child pornography which can be shown through these

12  downloads, there is a presumption against bond in that case.

13     THE COURT:  Right.

14     MS. CLEARY:  And so that's -- that's what I was going

15  to say, and that's what I was going to point out.  I believe

16  that given the posture of child pornography cases that there is

17  a difference when somebody is willing to cross the line and

18  physically touch a young child, and I think that Mr. Gray has

19  shown that he is capable of doing that and that he has this

20  pattern.  And again, we just have these 61 images, but that

21  certainly doesn't mean that there could be more.  And he's only

22  been charged with one.  And I understand that that's all that's

23  before the Court today, but what the Court knows is that he is

24  somebody who has openly admitted in the last couple of weeks to

25  spending the last 15 years sexually attracted to young women,

USCA4 Appeal: 22-4060   Doc: 6        Filed: 02/03/2022    Pg: 44 of 73
Case 7:22-cr-00001-PFC-RSB   Document 23   Filed 01/10/22   Page 42 of 51   Pageid#: 73

USA v. Jerald Francis Gray - 12/17/2021          42

1    to seeing young women or young girls out in public to see -- to

2    being -- to masturbating to the thought of prepubescent girls

3    and then ultimately to, you know, creating and constructing

4    interactions where he can touch them, including, you know, when

5    they are asleep.  So given that we know that this happened in

6    2005, and we know that he admitted to, you know, the babysitter

7    incident as we're calling it and we know that he has access to

8    children, I believe that he's still a danger to the community

9    given all of this information and that he should be detained.

10          THE COURT:  All right.  Thank you very much,

11   Ms. Cleary.

12          MS. LEE:  Your Honor, to be clear, I am not asking

13   the Court to release him and requiring the daughter to move

14   out.  I am saying he could --

15          THE COURT:  He could move out.

16          MS. LEE:  He would need to find a place.  He would

17   need to move out effective the minute he were released,

18   including temporary lodging until he could find a suitable

19   apartment.

20          THE COURT:  Right.

21          MS. LEE:  And I'm not going to address Ms. Cleary's

22   argument that the Court should treat it like a presumption case

23   because they could have charged it differently, because I think

24   that's --

25          THE COURT:  I can't do that.

1    MS. LEE:  -- not valid.

2    THE COURT:  Yeah, I cannot do that.

3    So here's where I am, Mr. Gray.  First of all, in the

4    bond cases there are really only two questions in front of me.

5    One is are you a flight risk, and, secondly, are you a danger

6    to the community.  There's not any issue here, and the

7    government does not argue, that you are a flight risk.  And so

8    the issue is whether you're a danger to the community.  That's

9    something that the government must prove by clear and

10   convincing evidence.

11   In that regard, there's been a lot of bantering back

12   and forth as to whether there's a presumption that you are to

13   be detained.  Given the way which you are presently charged,

14   that you're -- there is not a presumption that you are to be

15   detained.  You're charged with one count of possession of child

16   pornography as laid out in paragraph 11 of the complaint.  As

17   it relates to that, there is evidence -- there is probable

18   cause that you committed this offense.  I'm going to send that

19   to the grand jury

20   With respect to the conditions of detention versus

21   release, the factors I consider are this:  One is the nature of

22   the offense, and that is that you had in your possession child

23   pornography.  They were in a file folder with many -- and I'll

24   say many because I don't believe Ms. Witt testified that every

25   I guess file name was consistent with child pornography, but

USA v. Jerald Francis Gray - 12/17/2021          44

1    many of them were.  She has reviewed one video that she didn't

2    describe in detail on scene and then one video that was

3    provided to her that's described inside the criminal complaint.

4    But the circumstantial evidence would suggest it is consistent

5    with possession of much child pornography.  And with thorough

6    forensic evaluation of the evidence that was seized will

7    yield -- will yield an answer to that.

8           The evidence further consists that you are employed.

9    You own your home.  You have a good job.  You do not have a bad

10   criminal record.  I think there was -- I've got the criminal

11   record up here.  It shows that you had one prior felony in 2013

12   in which you were on supervised probation.  Are you off

13   supervised probation at this time?

14          THE DEFENDANT:  Yes, sir.  It was only three year

15   probation.

16          THE COURT:  All right.  So three years suspended and

17   three years probation.  All right.  And you had one other

18   charge in 2000 and another one in 1993 when you were much --

19   much younger.

20          The evidence that is -- and based upon that evidence

21   the government -- not the government, but probation had

22   recommended your release upon condition.

23          The evidence before me is what was yielded in this

24   post-polygraph interview and the interview at the time of the

25   search with Ms. Witt that suggests that there are two

USA v. Jerald Francis Gray - 12/17/2021          45

1    incidences in which there is conduct with a minor and -- and

2    that you have remained sexually attracted and have at least

3    acted with yourself in response to that attraction of sexual

4    minors -- of minors.

5              Based upon that and the evidence of going forward and

6    the number of files that were found, I do find you to be a

7    danger to the community.  I don't -- and what I would want to

8    consider, Ms. Lee, is whether there is a separate home plan.

9    Rather than simply release Mr. Gray and say you've got to go

10   live somewhere else, whether there is a separate home plan that

11   can be -- that can be fashioned in that regard.  But I also --

12   Ms. Witt, how long will this forensic evaluation be?

13             AGENT WITT:  I can't speak to that.  There were two

14   sort of computer hard drive towers, if you will, that will need

15   to be sent to Richmond to be evaluated by the CART agents, and

16   I'm hoping to be able to review some of the more external

17   storage datas that were seized here locally.

18             THE COURT:  Okay.  Well, so my ruling at this time,

19   Ms. Lee, is that the evidence before me establishes by clear

20   and convincing evidence that Mr. Gray is a danger to the

21   community, but the present home plan of either living with his

22   daughter and grandchildren -- which is not exactly what you're

23   saying, I recognize that -- is not acceptable and nor is it --

24   nor is a home plan of I'm going to release you and you've got

25   to find out -- figure out a place to live that's -- that does

USCA4 Appeal 22-4060    Doc: 6    Filed: 02/02/2022    Pg: 46 of 73
Case 7:22-cr-00001-FFC-RSB    Document 23    Filed 01/10/22    Page 46 of 51    Pageid#: 77

USA v. Jerald Francis Gray - 12/17/2021          46

1    not have minors there is likewise not acceptable.

2          I will allow you to come back and consider another

3    home plan, but I -- I am -- I'm also concerned about the extent

4    to which there is information if there are 60 files.  There is

5    no evidence right now in front of me as to the timing of when

6    that -- when that came back and when it was -- when they were

7    obtained.  I'll use those terms.  I don't draw any conclusions

8    one way or the other.

9          MS. LEE:  I have to gently object to the Court's sort

10   of taking an interest to when the evidence is going to be

11   available.  The government has -- the rest -- the government

12   decides when he gets arrested and the government --

13         THE COURT:  I agree with that.

14         MS. LEE:  -- goes forward on the evidence that it has

15   that day.  There's no provision to like let's see what else the

16   government can get.

17         THE COURT:  I'm not -- I'm not waiting for that.

18         MS. LEE:  Okay.

19         THE COURT:  What I'm concerned about is the fact that

20   there is -- there are a number of files.  There's evidence of

21   ongoing sexual interest between 2005 and 2021 of young -- young

22   girls and acting on that with himself after seeing young girls

23   and that there was contact in 2005 and maybe before.  And so

24   that concerns me a lot, that -- and so I'm not sure that even

25   living alone takes care of that issue.  So, you know, I'm not

Case 7:22-cr-00001-FPC-RSB Document 23 Filed 01/10/22 Page 47 of 51 Pageid#: 78

USA v. Jerald Francis Gray - 12/17/2021      47

1   asking the government to produce more evidence.  I think

2   you're -- you're right about that.  And that would be

3   inappropriate for me to do that.

4         MS. LEE:  The problem is the loss of his job, Your

5   Honor.  The loss of his job is going to have direct

6   consequences for him, obviously, but also his daughter and

7   grandchildren who are not currently involved in this case in

8   any way.  And I -- it just -- I think that that's -- it's not

9   helpful to us as a society to take somebody who has not been --

10  I mean, with all -- we all get sick listening to this type of

11  evidence, but we still have to separate what's illegal and

12  what's not illegal.  And masturbating is not illegal in any

13  universe.  The Court can only consider it to the extent that he

14  may act on it, and there's no evidence before this Court going

15  back 16 years of him ever acting on it.  So to say you're

16  losing your job, you're going to sit in jail, even though

17  you're ostensibly presumed innocent of the criminal charges, is

18  a net loss in this kind of -- you know, this economic crisis

19  that we're all in because of COVID, but he's -- his children,

20  his daughter and his grandchildren, especially if his daughter

21  has an addiction problem that she's struggling with and we're

22  just sort of -- we're making things worse for the world,

23  including the very people we're supposed to be protecting,

24  which is his daughter and his grandchildren.

25         I don't see any limitation on the Court's ordering

USA v. Jerald Francis Gray - 12/17/2021              48

1    him to not go home.  That happens all the time in domestic

2    abuse cases, yes, I'm releasing you but you can't go home.  The

3    person goes and takes their credit card and goes to a motel

4    until they find themselves a suitable studio apartment.

5            THE COURT:  I can tell you in the time that I've been

6    here, I've not released somebody without an established home

7    plan.

8            MS. LEE:  That's true.  This Court has not.  But in

9    other -- in a non -- I can certainly say that from other

10   districts in a nonpresumption case it happens all the time.  I

11   do agree that this Court has not done that.

12           THE COURT:  Correct.

13           MS. LEE:  But also we're putting this gentleman in

14   this ridiculous position of having to fashion a home plan

15   without having -- you know, we can see from his pretrial

16   services report he does not have family members he is close

17   with nearby.  He can't go live with his mother or whatever one

18   normally does in this situation.  So he's in a position where

19   from jail he's supposed to be arranging new homes that I can

20   present it to the Court, and I just --

21           THE COURT:  His daughter -- his daughter may be able

22   to help him to do that.  I mean --

23           MS. LEE:  That's true.  That is true.  That is true.

24   And I'm going to reach out to her.  Okay, thank you.

25           THE COURT:  Okay, all right.  Thank you.

USA v. Jerald Francis Gray - 12/17/2021          49

1        MS. LEE:  So the Court is saying "no home plan, I

2   can't reject him, but you come up with a home plan you can at

3   least file a motion" --

4        THE COURT:  I'll consider --

5        MS. LEE:  Okay, thank you.

6        THE COURT:  You don't need to file a motion.  Just

7   ask -- ask Ms. Davis or Ms. Ayersman.  Ms. Brown is out this

8   week.  I'm here this week and next week, and then I've got two

9   weeks that are going to be -- that I'm going to be

10  unavailable.

11       MS. LEE:  Which is richly -- your unavailability will

12  be richly deserved by you.  And if Ms. Brown is in like Hawaii

13  right now, then God bless her, because she works too hard.

14       THE COURT:  My unavailability may be more appreciated

15  by others than most.

16       Mr. Gray, in all seriousness, if you disagree with my

17  decision, you do have a right to appeal any decision to a

18  presiding district judge, we'll assign it.  Since it's a

19  criminal complaint at this time it does not have a judge

20  assigned, but we would assign it to a judge if you wish to

21  address it, so...

22       MS. LEE:  Oh, we just lost the judge.

23       THE CLERK:  I probably clicked a wrong button.

24       MS. LEE:  That's a first.

25       Brittany, will it be possible if we could talk to him

USA v. Jerald Francis Gray - 12/17/2021          50

```
1   briefly after court adjourns?

2            THE CLERK:  Sure.

3            MS. LEE:  Thank you.

4            PROBATION:  Christine, do you need his daughter's

5   phone number?

6            MS. LEE:  Oh, yeah.  That's actually what I was going

7   to ask him for, but I don't want it on the --

8            PROBATION:  I was going to say, well, I have to wait

9   until the public line goes off.

10           MS. LEE:  You can even email it to me.

11           PROBATION:  I'll email it to you.

12           MS. LEE:  Okay, thank you.

13           THE COURT:  I'm sorry I got disconnected.  I was

14  saying, Mr. Gray, you do have a right to appeal my decision to

15  the presiding district judge.  We will assign a judge if you

16  wish to do so, but that will be my decision.

17           All right, very well.  Anything else we need to

18  address, Ms. Cleary?

19           MS. CLEARY:  No, Your Honor.

20           THE COURT:  All right.  Ms. Lee?

21           MS. LEE:  No.  Mr. Gray, if you can just call my

22  office Monday morning, I'd be grateful.

23           THE DEFENDANT:  All right.  How do I get ahold of

24  you?

25           MS. LEE:  You tell them it's a Federal Public
```

USCA4 Appeal: 22-4060   Doc: 6   Filed: 02/02/2022   Pg: 53 of 73
Case 7:22-cr-00001-FFC-RSB   Document 23   Filed 01/10/22   Page 51 of 51   Pageid#: 82

USA v. Jerald Francis Gray - 12/17/2021          51

1    Defender and they will put you through, and they should make it

2    free for you.

3              THE DEFENDANT:  All right, thank you.

4         MS. LEE:  Thank you.

5         THE COURT:  All right, thank you.

6         We'll stand in recess.  Thank you.

7         MS. LEE:  Thank you.

8         MS. CLEARY:  Thank you.

9         (The proceedings concluded at 4:19 p.m.)

10                    **CERTIFICATE**

11        I, Mary J. Butenschoen, do hereby certify that the
     foregoing is a correct transcript of the electronic recording
12   in the above-entitled matter.

13              _____/s/_____1/10/2022
                Mary J. Butenschoen, Transcriber

14

15

16

17

18

19

20

21

22

23

24

25

AO 472  (Rev. 11/16)  Order of Detention Pending Trial

# UNITED STATES DISTRICT COURT

for the

Western District of Virginia

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| JERALD FRANCIS GRAY | )  Case No.  7:21MJ166 |
| | ) |
| *Defendant* | ) |

## ORDER OF DETENTION PENDING TRIAL

### Part I - Eligibility for Detention

Upon the

☑ Motion of the Government attorney pursuant to 18 U.S.C. § 3142(f)(1), or

❑ Motion of the Government or Court's own motion pursuant to 18 U.S.C. § 3142(f)(2),

the Court held a detention hearing and found that detention is warranted.  This order sets forth the Court's findings of fact and conclusions of law, as required by 18 U.S.C. § 3142(i), in addition to any other findings made at the hearing.

### Part II - Findings of Fact and Law as to Presumptions under § 3142(e)

❑ **A.  Rebuttable Presumption Arises Under 18 U.S.C. § 3142(e)(2)** *(previous violator)*:  There is a rebuttable presumption that no condition or combination of conditions will reasonably assure the safety of any other person and the community because the following conditions have been met:

    ❑ **(1)** the defendant is charged with one of the following crimes described in 18 U.S.C. § 3142(f)(1):

        ❑ **(a)** a crime of violence, a violation of 18 U.S.C. § 1591, or an offense listed in 18 U.S.C.
        § 2332b(g)(5)(B) for which the maximum term of imprisonment of 10 years or more is prescribed; **or**

        ❑ **(b)** an offense for which the maximum sentence is life imprisonment or death; **or**

        ❑ **(c)** an offense for which a maximum term of imprisonment of 10 years or more is prescribed in the
        Controlled Substances Act (21 U.S.C. §§ 801-904), the Controlled Substances Import and Export Act
        (21 U.S.C. §§ 951-971), or Chapter 705 of Title 46, U.S.C. (46 U.S.C. §§ 70501-70508); **or**

        ❑ **(d)** any felony if such person has been convicted of two or more offenses described in subparagraphs
        (a) through (c) of this paragraph, or two or more State or local offenses that would have been offenses
        described in subparagraphs (a) through (c) of this paragraph if a circumstance giving rise to Federal
        jurisdiction had existed, or a combination of such offenses; **or**

        ❑ **(e)** any felony that is not otherwise a crime of violence but involves:
        **(i)** a minor victim; **(ii)** the possession of a firearm or destructive device (as defined in 18 U.S.C. § 921);
        **(iii)** any other dangerous weapon; or **(iv)** a failure to register under 18 U.S.C. § 2250; *and*

    ❑ **(2)** the defendant has previously been convicted of a Federal offense that is described in 18 U.S.C.
    § 3142(f)(1), or of a State or local offense that would have been such an offense if a circumstance giving rise
    to Federal jurisdiction had existed; *and*

    ❑ **(3)** the offense described in paragraph (2) above for which the defendant has been convicted was
    committed while the defendant was on release pending trial for a Federal, State, or local offense; ***and***

    ❑ **(4)** a period of not more than five years has elapsed since the date of conviction, or the release of the
    defendant from imprisonment, for the offense described in paragraph (2) above, whichever is later.

AO 472 (Rev. 11/16) Order of Detention Pending Trial

❑ **B. Rebuttable Presumption Arises Under 18 U.S.C. § 3142(e)(3)** *(narcotics, firearm, other offenses)*: There is a rebuttable presumption that no condition or combination of conditions will reasonably assure the appearance of the defendant as required and the safety of the community because there is probable cause to believe that the defendant committed one or more of the following offenses:

    ❑ **(1)** an offense for which a maximum term of imprisonment of 10 years or more is prescribed in the Controlled Substances Act (21 U.S.C. §§ 801-904), the Controlled Substances Import and Export Act (21 U.S.C. §§ 951-971), or Chapter 705 of Title 46, U.S.C. (46 U.S.C. §§ 70501-70508);

    ❑ **(2)** an offense under 18 U.S.C. §§ 924(c), 956(a), or 2332b;

    ❑ **(3)** an offense listed in 18 U.S.C. § 2332b(g)(5)(B) for which a maximum term of imprisonment of 10 years or more is prescribed;

    ❑ **(4)** an offense under Chapter 77 of Title 18, U.S.C. (18 U.S.C. §§ 1581-1597) for which a maximum term of imprisonment of 20 years or more is prescribed; **or**

    ❑ **(5)** an offense involving a minor victim under 18 U.S.C. §§ 1201, 1591, 2241, 2242, 2244(a)(1), 2245, 2251, 2251A, 2252(a)(1), 2252(a)(2), 2252(a)(3), 2252A(a)(1), 2252A(a)(2), 2252A(a)(3), 2252A(a)(4), 2260, 2421, 2422, 2423, or 2425.

❑ **C. Conclusions Regarding Applicability of Any Presumption Established Above**

    ❑ The defendant has not introduced sufficient evidence to rebut the presumption above, and detention is ordered on that basis. *(Part III need not be completed.)*

    **OR**

    ❑ The defendant has presented evidence sufficient to rebut the presumption, but after considering the presumption and the other factors discussed below, detention is warranted.

### Part III - Analysis and Statement of the Reasons for Detention

    After considering the factors set forth in 18 U.S.C. § 3142(g) and the information presented at the detention hearing, the Court concludes that the defendant must be detained pending trial because the Government has proven:

    ☑ By clear and convincing evidence that no condition or combination of conditions of release will reasonably assure the safety of any other person and the community.

    ❑ By a preponderance of evidence that no condition or combination of conditions of release will reasonably assure the defendant's appearance as required.

In addition to any findings made on the record at the hearing, the reasons for detention include the following:

    ☑ Weight of evidence against the defendant is strong
    ❑ Subject to lengthy period of incarceration if convicted
    ❑ Prior criminal history
    ❑ Participation in criminal activity while on probation, parole, or supervision
    ❑ History of violence or use of weapons
    ❑ History of alcohol or substance abuse
    ❑ Lack of stable employment
    ❑ Lack of stable residence
    ❑ Lack of financially responsible sureties

AO 472  (Rev. 11/16)  Order of Detention Pending Trial

❏ Lack of significant community or family ties to this district
❏ Significant family or other ties outside the United States
❏ Lack of legal status in the United States
❏ Subject to removal or deportation after serving any period of incarceration
❏ Prior failure to appear in court as ordered
❏ Prior attempt(s) to evade law enforcement
❏ Use of alias(es) or false documents
❏ Background information unknown or unverified
❏ Prior violations of probation, parole, or supervised release

OTHER REASONS OR FURTHER EXPLANATION:

The clear and convincing evidence shows that the evidence of the underlying offense is strong, and further evidence shows that the defendant has been involved in past contact offenses with minors. The proposed home plan did not reasonable assure the safety of the community given the strength of the evidence submitted at the detention hearing.

## Part IV - Directions Regarding Detention

The defendant is remanded to the custody of the Attorney General or to the Attorney General's designated representative for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal.  The defendant must be afforded a reasonable opportunity for private consultation with defense counsel.  On order of a court of the United States or on request of an attorney for the Government, the person in charge of the corrections facility must deliver the defendant to a United States Marshal for the purpose of an appearance in connection with a court proceeding.

Date:        12/21/2021                              *Robert S. Ballou*
_____          _____
                                                    United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF VIRGINIA**
**ROANOKE DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 7:21mj00166** |
| | ) | |
| **JERALD FRANCIS GRAY** | ) | |

**ORDER**

Defendant has proposed a home plan to include staying in an America's Best Value Inn in Covington, Virginia. The proposed plan does not reasonably assure the safety of the community given the nature of the present offense alleged and the admissions to federal law enforcement officers regarding past contact offenses. The request for release to the proposed home plan is DENIED.

It is so ORDERED.

Enter:   January 3, 2022

*/s/ Robert S. Ballou*

Robert S. Ballou
United States Magistrate Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

United States of America

        v.                        Docket No. 7:21-MJ-166

Jerald Francis Gray

**Defendant's Request for District Court to review Magistrate's Order of Detention**

This case presents the following question: can the court reasonably assure the safety of the community by imposing conditions of release for a 49-year-old working grandfather with strong community ties and a minor criminal record who is not charged with an offense that carries a presumption of detention or that alleges he engaged in any violent activity? Yes, and if the Court agrees, it must order his release. *See* 18 USC 3142. Because the Magistrate concluded otherwise, Mr. Gray requests the District Court review the magistrate's order of detention under 18 USC 3142(b).

     Jerald Gray is charged by complaint with violating 18 USC 2252(a)(4)—an offense that does not carry a presumption of detention under the Bail Reform Act. Pretrial Services recommended his release. Indeed, Mr. Gray has a minor criminal record, a job, and a local residence. He has significant ties to the area and has lived in this district for thirty years. He has remained in the same house for the past twenty, where he lives with his daughter and two grandchildren. He supports his family—having been steadily employed since 2001—was cooperative with law enforcement (even agreed to take a polygraph examination) and has never been alleged to have engaged in any violent actions. In 2013, Mr. Gray was sentenced to serve three years of supervised probation after pleading to a synthetic marijuana charge. He completed probation successfully without violating. All

evidence suggests he can be supervised, including his criminal history. Because he lives with two minor children, Mr. Gray offered to reside at a local motel should the court be concerned about his living arrangements.[1] He is willing to abide by conditions of release, his past shows he can abide by conditions of release, he has significant community ties and no evidence suggests his release would pose an unreasonable risk of danger to the community. As such, he requests the District Court review the Magistrate's findings *de novo* pursuant to 18 USC 3145(b).[2]

Respectfully submitted, By: /s/ Benjamin M. Schiffelbein

> Benjamin M. Schiffelbein, Esquire
> Asst. Federal Public Defender
> NH Bar No. 267593
> 210 First Street SW, Room 400
> Roanoke, Virginia 24011
> Ph. (540) 777-0880
> Fax (540) 777-0890
> Benjamin_Schiffelbein@fd.org

---

[1] There is no credible evidence suggesting that Mr. Gray's release would endanger his grandchildren. No evidence uncovered during the search warrant execution, Mr. Gray's polygraph, or his interrogation supports such a claim. Nor does any statistical evidence support a proposition that, because Mr. Gray is accused of this offense, he would likely commit further, more-serious sexual offenses against his grandchildren. In any event, probation reviewed this home plan and informed the court that the alternative home plan was viable.

[2] The law is unclear whether District Courts must conduct a *de novo* review of a Magistrate's order and what procedures it should follow when doing so. In *United States v. Clark*, the Fourth Circuit stated in dicta that a "district court review of a magistrate's detention order is *de novo*." 865 F.2d 1433, 1437 (4th Cir. 1989) (citing *United States v. Williams*, 753 F.2d 329, 333 (4th Cir. 1985). And in *Williams*, the Court indicated both that *de novo* detention hearings are separate from bond reviews under 3145(b), but that reviews under 3145(b) can be transformed into *de novo* hearings even without the presentation of additional evidence. *See Williams*, 753 F.2d at 333 ("although the motion for review of the magistrate's detention order . . . technically was transformed into a *de novo* detention hearing . . . no additional evidence on the issue of dangerousness or lack thereof was introduced").[2]

Courts generally agree that district courts should conduct a *de novo* review. *United States v. Leon*, 766 F.2d 77, 80 (2nd Cir. 1985). *But see United States v. Munchel*, 991 F.3d 1273, 1280 (D.C. Cir. 2021) (not reaching "appellants' contention that the District Court erred in not deferring to [the] Magistrate['s] factual findings as to [the defendants'] dangerousness"); *United States v. Gaviria*, 828 F.2d 667, 670 (11th Cir. 1987) (finding no error where District Court refused to conduct a "*de novo* hearing" but where Court did "properly afford[ ]  *de novo* review of the magistrate's detention order").

Appellant's App. 57

IN THE UNITED STATES DISTRICT COURT
FOR THE WETERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CRIMINAL NO. 7:22cr00001 |
| | * | |
| JERALD FRANCIS GRAY | * | |
| | * | |
| Defendant | * | |
| | * | |
| | * | |
| | ******* | |

## RESPONSE IN OPPOSITION TO MOTION FOR BOND REVIEW

Defendant moves for review of his detention order pursuant to 18 USC 3145(b).  The government respectfully requests that this Court affirm the current detention order because there are no conditions or combination of conditions that can adequately assure the safety of minors in the community.

On December 16, 2021, the Defendant was charged in a criminal complaint with possession of child pornography in violation of 18 U.S.C. §2252(a)(4).  Defendant was arrested and a bond hearing was held the next day.

At the bond hearing, Agent Lynne Witt testified that:

- The FBI became aware of an IP address requesting images of child sexual abuse material over a peer to peer network.  December 17, 2020 Hearing Transcript ("Tr.") 12: 11-13.  Law enforcement learned that the Defendant was the owner of that IP address. *Id.* 12:16-20.  The FBI learned that the IP address was attached to a residence owned by the Defendant where he resided with his adult daughter and two minor grandchildren. *Id.* 12:24-13:9.
- The two minors residing with the Defendant are approximately seven and eight years old. *Id.* 13:11.  Both are female. 28:16.
- The FBI secured a search warrant for the residence.  Upon execution of the search warrant, the FBI saw a computer running the peer-to-peer network relevant to the initiation of the investigation.  On that computer there was a "downloads" folder containing approximately 60 video files.  The names of these files were indicative of child sexual abuse material. *Id.* 13:24-14:9.

- Several of the files in the folder were reviewed by Agent Witt and were determined to be videos involving the use of a minor who had not attained 12 years of age engaging in sexually explicit conduct. *See, id* 14:13-14, 15:3-8, 19:20-25.
- The Defendant admitted that the computer containing the child pornography was in his bedroom and was for his personal use. *Id.* 13:17-20.
- The Defendant admitted to downloading files from the peer-to-peer network and admitted to downloading child sexual abuse material. *Id.* 15:13-23.
- The Defendant also admitted to having kissed the breasts of a then-12 year old spending the night in his house in 2005. *Id.* 16:12-17, 20-21, 24.
- The Defendant further admitted to touching the breasts of a babysitter who worked at his house prior to 2005. *Id.* 18:3-9.
- The Defendant indicated a sexual attraction to minors. *See, e.g.,* 18:18-22.

Because the Defendant admitted to engaging in "hands-on" sexual abuse of at least two minors, the government requested detention. At the time of the original bond hearing, the Defendant was unable to present a home-plan that did not involve living with his minor grandchildren. The Court therefore ordered that the Defendant detained, but allowed the Defendant to present a home plan and have detention reconsidered without filing a motion. *Id.* 49:1-10.

On December 29, 2021, the Defendant presented a home plan for Mr. Gray to reside at Americas Best Value Inn in Covington, Virginia. The Court found that "the proposed plan does not reasonably assure the safety of the community given the nature of the present offense alleged and the admissions to federal law enforcement officers regarding past contact offenses. The request for release to the propose home plan is denied." ECF No. 18. On January 3, 2022, the Defendant requested that the District Court review of the detention order. ECF No. 20.

On January 13, 2022, the Defendant was changed by a Grand Jury in a one-count Indictment with possession of child pornography in violation of 18 U.S.C. §2252(a)(4). ECF No. 27.

## Argument

The United States respectfully submits that Defendant's motion should be denied, as there are no conditions or combination of conditions which will reasonably assure the safety of the community and the detention order was properly entered.

### I.    Legal Standards for Pre-Trial Detention

A defendant must be detained pending trial where "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). Detention is thus appropriate where a defendant is either a danger to the community or a flight risk.

Categorical grants or denials of detention, untethered from an individualized determination, are impermissible. That is because the Bail Reform Act mandates an individualized evaluation guided by the factors articulated in § 3142(g). Those factors are:

(1)    the nature and circumstances of the offense charged, including whether the offense … involves a minor victim … ;

(2)    the weight of the evidence against the defendant;

(3)    the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

4)    the nature and seriousness of the danger to any person or to the community that would be posed by the defendant's release.

18 U.S.C. § 3142(g).

18 USC 3145(b) allows a person detained to file a motion for review of the detention order by the District Court.

## II.    The § 3142 Factors Weigh in Favor of Detention:  Defendant Is A Risk to Minors

The Defendant is charged with serious crimes against children.  The United States alleges that the Defendant downloaded almost sixty videos depicting child abuse material from a sophisticated peer-to-peer network allowing users to remain anonymous.  These videos were immediately visible upon execution of a search warrant.  Forensic review of the computers and phones in Defendant's home is ongoing and the investigation continues.  The weight of the evidence is strong.   The videos were readily visible to law enforcement and the Defendant has twice admitted to the specifically charged conduct.

Moreover, Defendant admitted to actually abusing two minors.  He admitted to acting on his sexual attracting to minors on at least two occasions, touching and kissing the breasts of minors who spent time in his home.[1]

The United States submits that the Detention Order was properly entered because the Defendant's current offense and history of contact offenses present a serious danger to the community in the event of his release.  The Defendant has admitted that given the opportunity, he twice sexually abused minors in his home.  Given his also admitted continued attraction to young teenage girls, the proffered home plan is not adequate to protect this specific and vulnerable community.

As found at the bond hearing, Mr. Gray cannot safely live in a home with two young grandchildren.  Not only for the sake of the grandchildren, but for the safety of those who might come into a home where there are children, such as friends and babysitters, the same population Defendant admitted to abusing when his daughter was younger.  But neither does the now offered home plan of a hotel protect the community.  At a hotel, the Defendant will have access to a wide

---

[1] The United States agrees that the Defendant is not a flight risk.

swath of the community.  There is no plan in place to prevent the Defendant from coming into

contact with minors likely to be staying at these accommodations open to the public.  Nor is there

a plan to prevent the Defendant from accessing the internet and continuing his victimization of

minors by accessing images that memorialize minor's abuse.  With public wi-fi it may be difficult

to track the Defendant's internet usage.

### Conclusion

For the foregoing reasons, the Court should deny the defendant's motion for release.

Respectfully submitted,

CHRISTOPHER R. KAVANAUGH
United States Attorney

/s/      Rachel Barish Swartz
Rachel B. Swartz, N.Y. Bar No. 4667044
Assistant United States Attorney
255 West Main Street, Room 130
Charlottesville, Virginia 22901
434-293-4283
Rachel.Swartz@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on January 21, 2022 I electronically filed the foregoing Response with the Clerk of the Court using the CM/ECF System, which will send notice, and constitute service, of such filing to the following registered CM/ECF user(s):

/s/Rachel Barish Swartz
Rachel Barish Swartz
Assistant United States Attorney

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 7:22-cr-00001 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| JERALD GRAY, | ) | By:  Hon. Thomas T. Cullen |
| | ) | United States District Judge |
| Defendant. | ) | |

Defendant Jerald Gray ("Defendant") requests review of the United States Magistrate Judge's Order of Detention Pending Trial and seeks release on terms and conditions. As explained below, the court concludes, based on clear and convincing evidence, that there are no conditions of release that "will reasonably assure . . . the safety of any other person and the community . . . ." 18 U.S.C. § 3142(e)(1). It will therefore deny Defendant's request for pretrial release.

## Background

Defendant is charged with unlawful possession of child pornography, in violation of 18 U.S.C. § 2252(a)(4)(B).[1] At his initial appearance, the government moved for detention pending trial, and the Magistrate Judge conducted an evidentiary hearing on the motion. The government called FBI Special Agent ("SA") Lynne Witt to testify about the evidence underlying the child-pornography charge and various admissions Defendant made prior to his arrest.

---

[1] The government initially arrested Defendant on a criminal complaint filed on December 16, 2021, and a grand jury returned an indictment charging that offense on January 13, 2022. (*See* ECF Nos. 3 [criminal complaint] and 27 [indictment].)

SA Witt first provided a detailed overview of her investigation of Defendant and how the government came to suspect him of committing the instant offense. Specifically, SA Witt testified that after learning that a person utilizing a particular internet protocol ("IP") address had accessed a peer-to-peer file sharing network involving child pornography, she determined that the IP subscriber was Jerald Gray, and that he resided at 610 East Cedar Street in Covington, Virginia. (Bond Hr'g Tr. 12:4–20, Dec. 17, 2021 [ECF No. 23].) SA Witt testified that she then obtained a federal search warrant for the residence, which she and other agents executed on December 8, 2021. During this search, SA Witt testified that Defendant "volunteered to an interview." (*Id.* at 13:17.) SA Witt related that Defendant identified which bedroom in the residence was his, admitted that the computer located in that bedroom belonged to him, and admitted that he was the computer's primary user. SA Witt further testified that two FBI forensic examiners, who were on scene for the execution of the search warrant, accessed Defendant's computer and determined that its hard drive contained approximately 60 separate files depicting child pornography. Some of these files depicted minors under the age of 12 engaged in sexual activities. According to SA Witt, Defendant admitted to downloading these images from the peer-to-peer file sharing network and viewing them. (*Id.* at 14:10–15:23.)

SA Witt asked Defendant if he would be willing to undergo a polygraph examination, and Defendant agreed to do so. During the post-polygraph interview,[2] Defendant was asked about a 2005 incident involving a 12-year-old female that had been visiting his minor daughter

---

[2] SA Witt did not reveal—and the court does not know—the results of the polygraph examination. The court only considers the admissions Defendant made to the agents during this post-polygraph interview.

at their residence.[3] Defendant admitted that he had, in fact, sexually molested this child—specifically, by touching and kissing her breasts.[4] (*Id.* at 16:12–17:21.) Defendant also acknowledged that, on at least one other occasion prior to 2005, he touched the breasts of an underage babysitter, also at his home. (*Id.* at 17:25–18:9.) Defendant admitted during this second interview that he "preferred" early- or pre-teen girls, but that he was not interested in young children. (*Id.* at 18:10–14.) In addition, Defendant described prior occasions when he had seen minor females in public, and then returned home and "masturbate[d] when thinking about that young female he had seen . . . ." (*Id.* at 18:15–22.)

At the time of the search and Defendant's subsequent arrest, Defendant's adult daughter and two grandchildren also lived in his home. In support of his petition for review, Defendant represents that he is willing to reside at a local hotel—and away from his minor grandchildren—to mitigate any concerns about risk of harm to them.[5]

## Standard of Review

When a magistrate judge orders the detention of a criminal defendant, the defendant "may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order." 18 U.S.C. § 3145(b). The district court reviews the original

[3] In investigating Defendant's background prior to the execution of the search warrant, SA Witt learned of the 2005 allegations involving Defendant and the child. (*See* Bond Hr'g Tr. 16:24–17:11.) Although the local police apparently investigated that incident at the time, no charges were ever filed.

[4] The minor victim reported shortly after the incident that Defendant had also touched her buttocks area, but Defendant told the FBI agents that he could not recall whether he had done that as well. (*See id.* at 19:8–12.)

[5] Defendant also proposed the same to the Magistrate Judge after the entry of the original order of detention. The Magistrate Judge, after considering the proposal, concluded that it "does not reasonably assure the safety of the community given the nature of the present offense alleged and the admissions to federal law enforcement officers regarding past contact offenses." (Order, Jan. 3, 2022 [ECF No. 18].)

detention order *de novo. See United States v. Sprouse,* No. 3:12cr200, 2012 WL 2366455, at *2
(W.D.N.C. June 21, 2012). But the reviewing court may rely on the record from the original
bond hearing and is not required to conduct a second evidentiary hearing. *See United States v.
Jackson,* No. 7:19-cr-126, 2016 WL 4689144, at *1 (E.D.N.C. Sept. 25, 2019). The court has
carefully reviewed the record from the December 17, 2021 detention hearing and finds that a
second hearing and additional oral argument would not aid its decision.[6]

### Analysis

In this case, the government seeks detention under 18 U.S.C. § 3142(f)(1)(E), arguing
that Defendant, if he were released, would pose a danger to the community. In determining
whether that is, in fact, the case, the court must consider: (1) the nature and circumstances of
the offense; (2) the weight of the evidence against the defendant; (3) the history and
characteristics of the defendant; and (4) the nature and seriousness of the danger that the
defendant's release would present to any person. 18 U.S.C. § 3142(g). Defendant is charged
with a violation of 18 U.S.C. § 2252(a)(4)(B), so there is <u>not</u> a rebuttable presumption in favor
of detention. "[T]he government must [therefore] convince a neutral decisionmaker by clear
and convincing evidence that no conditions of release can reasonably assure the safety of the
community or any other person." *United States v. Salerno,* 481 U.S. 739, 750 (1987).

Based on the evidence presented at the detention hearing, the court finds that the
government has satisfied this burden, and that the Magistrate Judge was correct in ordering
the Defendant's detention pending trial. The charged offense—possession of child

---

[6] Defendant filed a brief in support of the instant petition for review. (ECF No. 21.) The court has also
considered that, as well as the government's response in opposition. (ECF No. 30.)

pornography—is a serious one. Because the government has alleged that one or more of the pornographic images depicted a child younger than 12, Defendant faces a maximum possible penalty of 20 years in prison. Although Defendant is presumed innocent of this offense, the evidence against him is very strong. As noted above, he is the registered owner of the IP address utilized to download the images at issue, and he admitted to investigators that he utilized his computer (and the IP address) to download and view these images. And an examination of Defendant's hard drive confirmed that it contained at least 60 images depicting child pornography, including unlawful images of children under the age of 12.

Defendant nevertheless argues that his history and characteristics demonstrate that he does not pose a danger to the community and is a viable candidate for release on terms and conditions. Defendant points out that he has a minor criminal record,[7] he has lived in the district for approximately 30 years, he has long maintained steady employment, and he is the sole provider for his adult daughter and her two children (Defendant's grandchildren), who reside with him. (*See generally* Def.'s Mot. for Bond Review, Jan. 3, 2022 [ECF No. 21].)

Although the court credits these positive qualities, it cannot overlook his recent admissions to federal law enforcement agents that he sexually molested minors at his home on multiple occasions. In addition, he readily acknowledged having a predilection for teenage and pre-teen girls and taking steps to gratify himself sexually after seeing children in public. Considering this in conjunction with the evidence related to the charged offense—specifically, that Defendant recently accessed, downloaded, and viewed up to 60 images depicting child

---

[7] Defendant pleaded guilty to possession of synthetic marijuana in 2013, and the court sentenced him to three years of supervised probation. He completed probation without incident.

pornography—the court finds that Defendant does, in fact, pose a danger to the community, particularly minor females.

Finally, Defendant contends this risk can be mitigated by imposing a condition of release that bars him from his residence and requires him to live in a nearby hotel. In making this argument, Defendant assumes that the court's primary concern regarding his purported dangerousness relates to his minor grandchildren. Accordingly, Defendant proffers that "there is no credible evidence that [he] would endanger his grandchildren." (*Id.* at 2 n.1.) While this may be true, there is abundant evidence in the record that Defendant, through his prior acts of child molestation and procuring child pornography, poses an acute risk to *other* persons in the community—particularly minor females who are not members of his immediate family. Therefore, the court concludes that allowing Defendant to live in a hotel would not eliminate that danger.

## Conclusion

For these reasons, the court will deny Defendant's petition and order him detained pending trial.

The clerk is directed to forward a copy of this Memorandum Opinion and accompanying Order to all counsel of record.

**ENTERED** this 21st day of January, 2022.

*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE

**From:** Benjamin Schiffelbein
**To:** "Kelly Brown"; Kimberly Falatic
**Cc:** Christine Lee; Swartz, Rachel (USAVAW) 1
**Subject:** RE: Jerald Gray Home Plan
**Date:** Wednesday, December 29, 2021 9:47:00 AM

The defense relies on its arguments presented at the initial appearance as well as Probation's assessment of the new proposed plan.

Best,

Benjamin Schiffelbein (he/him)
Assistant Federal Public Defender
210 First Street SW, Roanoke VA 24011
██████████████

**From:** Kelly Brown ██████████████ >
**Sent:** Wednesday, December 29, 2021 9:43 AM
**To:** Benjamin Schiffelbein ██████████████ >; Kimberly Falatic ██████████████ >
**Cc:** ██████████████ >; ██████████ (USAVAW) 1 < ██████████████ >
**Subject:** RE: Jerald Gray Home Plan

Morning all,

Judge Ballou can rule on this home plan and make his decision upon this proposed home plan, unless a hearing is requested by either party.

If either of you want a hearing it would likely be set the week of January 18, 2022.

Thank you,

Kelly

Kelly Brown
Courtroom Deputy,  USDC/WDVA
210 Franklin Rd., SW, Suite 540
Roanoke, Virginia  24011-2208
██████████████

**From:** Benjamin Schiffelbein ██████████████ >
**Sent:** Wednesday, December 29, 2021 8:24 AM

**To:** Kimberly Falatic <████████████████████>; Kelly Brown
<████████████>
**Cc:** Christine Lee <████████████████>; Swartz, Rachel (USAVAW) 1 <████████████████████>
**Subject:** RE: Jerald Gray Home Plan

Hi Kelly,

I removed Judge Ballou from this email and replaced him with you. Does the Court require anything additional to consider this home plan? I did not believe I had to file anything given that probation reached out directly to the court. However, I'm happy to file something right away.

Best,

---

**From:** Kimberly Falatic <████████████████████████>
**Sent:** Tuesday, December 21, 2021 10:59 AM
**To:** Robert Ballou <████████████████████>
**Cc:** Christine Lee <████████████████>; Benjamin Schiffelbein <████████████████████>;
Swartz, Rachel (USAVAW) 1 <████████████████>
**Subject:** Jerald Gray Home Plan

Good Morning Your Honor and Counsel,

Ms. Lee contacted me yesterday with a proposed home plan for Mr. Gray. She had spoken with Gray's daughter and advised that Americas Best Value Inn, located at 908 Valley Ridge Road, Covington, Virginia, works with the VADOC to house releasees and requested the probation office investigate this as a potential release plan for Mr. Gray. With the holiday week the probation office was unable to physically inspect the hotel; however, I spoke to them this morning and confirmed they have rooms available for rent. They also permit individuals charged with sex offenses to rent rooms and offer a daily rate of $45 plus tax or $350 weekly ($386.05 with tax).

If you have any questions or need any further information, please don't hesitate to call me on my cell at ████████

Kim



Kimberly Falatic
Supervising
U.S. Probation Officer
Western District of Virginia
210 Franklin Road, Room 402
Roanoke, VA 24011 ████████

Appellant's App. 71